UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

LAURA KATHERINE MCBEE,     )
                                    )
        Plaintiff,           )
                                    )
v.                              )     No.:   3:05-CV-561
                                    )               (VARLAN/GUYTON)
TENNESSEE VALLEY AUTHORITY;     )
BOARD OF DIRECTORS OF THE        )
TENNESSEE VALLEY AUTHORITY,    )
BILL BAXTER, Chairman, and        )
SKILA HARRIS, Director, in their     )
official capacities,                )
                                    )
        Defendants.        )

## MEMORANDUM OPINION

This is an employment discrimination action between plaintiff Laura Katherine McBee ("Plaintiff") and defendants Tennessee Valley Authority ("TVA") and Board of Directors of the Tennessee Valley Authority, Bill Baxter, Chairman, and Skila Harris, Director, in their official capacities (hereinafter collectively referred to as "the Defendants"). The case is before the Court for a decision on the merits following a four-day bench trial that took place between August 13 and August 16, 2007. Plaintiff seeks back and front pay, benefits, attorney fees and costs, and additional or alternative relief as this Court deems just, proper, and equitable for an alleged violation of the Age Discrimination in Employment Act ("ADEA") by the Defendants. [*See* Doc. 95 at 4.] Defendants contend that Plaintiff's nonselection for the position at issue was not motivated by age discrimination. [*See id.*]

After giving careful consideration to the testimony of the witnesses, the exhibits introduced at trial, the transcripts of the proceedings [*see* Docs. 100-03], the proposed findings of fact and conclusions of law [*see* Docs. 88, 90, 108, 110], the post-trial briefs [*see* Doc. 109], and the applicable law, the Court makes the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a).[1]

## I. FINDINGS OF FACT[2]

1. In 2004, TVA's Human Resources department went through a reorganization in which the Human Resources groups of (1) TVA University, (2) STAR 7, and (3) Organizational Development were to be consolidated into a new group entitled

---

[1]At trial, Plaintiff objected to the admissibility of Defendant's Exhibit 7, TVA's Final Agency Decision. [Doc. 102 at 447-49.] After reviewing the relevant case law, the Court overrules Plaintiff's objection. Federal Rule of Evidence 803(8)(C) provides that "[r]ecords, reports, statements, or data compilations in any form, of public offices or agencies, setting forth . . . in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C). The Supreme Court has recognized that "[p]rior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo." *Chandler v. Roudebush*, 425 U.S. 840, 864 (1976). Similarly, the Sixth Circuit admitted an examiner's findings because they were "factual findings resulting from an investigation made pursuant to authority granted by law." *United States v. Sch. Dist. of Ferndale, Michigan*, 577 F.2d 1339, (6th Cir. 1978) (quoting Fed. R. Evid. 803(8)(C). Furthermore, there is a presumption of admissibility, and "the party opposing the admission of the report must prove that the report is not trustworthy." *Bank of Lexington & Trust Co. v. Vining-Sparks Securities, Inc.*, 959 F.2d 606, 616 (6th Cir. 1992). In the present case, Plaintiff has not sufficiently proved that TVA's Final Agency Decision is not trustworthy. Finally, the Court notes that even if TVA's Final Agency Decision were excluded as evidence, this exclusion would not change the Court's findings of fact or conclusions of law in this case.

[2]The Court only makes the findings of fact necessary to reach its conclusions of law.

Organizational Effectiveness. [Doc. 100 at 116.] The reorganization was to take effect in July of 2004. [Doc. 101 at 393.]

2.      As part of the reorganization, a new position was created, Manager, Solutions Support. [Doc. 102 at 431; D. Ex. 18.] The Manager, Solutions Support, job announcement included the duties of "partners w/OE Perf cons to profile bus unit performance by analyzing/reporting on full range of performance measures. Ensures effective use of scheduling, registering, forecasting, recordkeeping and related processes in support of intervention mobilization. Manages technology based learning infrastructure/deployment." [P. Ex. 10.] The minium qualifications for the position included a preference for "information technology, statistics or related field." [*Id*.] On April 14, 2004, Lane Fitzgerald ("Fitzgerald") was selected for the Manager, Solutions Support, position. [Doc. 102 at 432.]

3.      After the reorganization, the Coordinator, Education & Outreach, position had the duty to manage "TVA's tuition reimbursement program" and "TVA's employee dependent scholarship program." [P. Ex. 9.] The minimum qualifications in the job announcement expressed no preference for qualifications in information technology or statistics. [*Id*.] David Graham was selected for the Coordinator, Education & Outreach, position. [Doc. 102 at 491.]

4.      Prior to April 14, 2004, Fitzgerald did not know he was going to be manager of the position currently at issue because he was not selected for the Manager, Solutions Support, position until that date. [*Id.* at 432.]

3

5.      According to the organizational chart for the Organizational Effectiveness Group, two Learning and Development Representatives ("L&D Rep") reported to the Manager, Solutions Support. [D. Ex. 18.]

6.      Prior to the reorganization, Judy Santos ("Santos") and Terry King ("King") were L&D Reps Level C. While the positions had some overlapping duties, Santos worked with contracts, the budget, and inventory. King was responsible for scheduling and was the System Administrator for TVA University and corporate groups at TVA. [Doc. 100 at 21, 49; P. Ex. 30.]

7.      As L&D Rep Level C, Santos used the software program Microsoft Access to perform inventory. [Doc. 100 at 49.]

8.      The L&D Rep Level C position at issue became vacant when King accepted a job in a different organization on April 16, 2004. [Docs. 101 at 394; 102 at 433-34.]

9.      The Vacant Position Announcement ("VPA") for the L&D Rep, Level C position was posted on April 16, 2004. [P. Ex. 1.] The closing date for the position was April 28, 2004. [*Id.*]

10.     Michelle Haney's ("Haney") application for the L&D Rep Level C position was received on April 21, 2004. The accompanying resume outlined Haney's professional experience with TVA from 1999 to 2004. The resume described her prior work experiences as L&D Rep since 2000, Data-Entry Clerk for TVA's Tuition Reimbursement Program, Administrative Assistant for Vice President of Quality Resources, and Administrative Assistant for Senior Management in Diversity

Development.  Haney's resume included non-TVA work experience with Capache Transportation, Inc., where Haney worked as an executive assistant, director of personnel, and safety clerk in addition to her position as an administrative assistant/receptionist at Knoxville Business College.  [P. Ex. 3.]

11.  Haney received ratings of "fully adequate" or "better than fully adequate" in her employee service report for the period of October 1, 2002, to September 30, 2003.  [P. Ex. 13.]

12.  Plaintiff's application for the L&D Rep Level C position was received on April 27, 2004.  Plaintiff's accompanying resume described her prior work experience with the STAR 7 program since 2001 in addition to other administrative and secretarial positions with TVA starting in 1985.  [P. Ex. 4.]

13.  Plaintiff received ratings of "fully adequate" or "better than fully adequate" in her employee service reports for periods ranging from October 1, 1997, to September 30, 2000. [P. Ex. 14.]

14.  The VPA provided the minimum qualifications for the L & D Rep, Level C position:

Demonstrated ability to analyze, interpret & apply appropriate business standards, processes & procedures.  Ability to participate effectively on formal & informal teams.  Ability to present ideas & information clearly through oral & written communications.  Ability to interact positively & effectively w/ internal and external customers and stakeholders.  Knowledge of TVA University.  Working knowledge of management information systems, preferably using ATIS.  Knowledge of classroom & distance learning equipment capabilities.  Experience in coordinating space utilization.

[P. Ex. 1.]

15. The VPA provided a summary description of duties for the L&D Rep, Level C position:

> Applies knowledge & experience of principles, practices, processes & resources in admin of management information systems & in delivery of learning events for TVAU & its system of service providers. Typical duties: Serves as system administrator for the Automated Training Information System (ATIS) & the online Learning Management System (LMS); Develops course schedules; Coordinates distance learning simulcasts; Acts as primary contact for coordination of student registration process w/ the Employee Service Center (ESC); Develops/updates key business processes & identifies/recommends improvement opportunities; Operates & Maintains training space.

[*Id.*]

16. VPA job descriptions are not detailed because there is a limited amount of space on ths system; thus, the job descriptions are sometimes summarized. [Doc. 101 at 295-96.]

17. The VPA for the L&D Rep Level C position includes the duty of applying "knowledge & experience of principles, practices, processes & resources in admin of management information systems." [P. Ex. 1.] This job description is broad enough to include relational databases, such as Access and Oracle. [Doc. 101 at 370.]

18. Fitzgerald could not revise the job description to include Access and Oracle because job descriptions are general job descriptions that cover all of TVA. The L&D Rep job description must cover all organizations that have L&D Rep positions. [*Id.* at 367.]

19. TVA has outlined general steps for filling positions with current TVA employees. The steps normally include: (1) Identifying the vacancy; (2) Developing the job

description; (3) Classifying the position; (4) Preparing and posting the vacancy announcement; (5) Developing a list of qualified candidates by reviewing personal history records (PHRs), resumes, applications, and other background information; (6) Selecting candidates for interviews to participate in the selection process (i.e., structured interview, etc.); (7) Conducting selection process; (8) Making the selection and extending the offer; and (9) Notifying candidates not selected. [P. Ex. 2.]

20.   TVA Human Resources has a matrix that it encourages selecting managers to utilize. [Doc. 101 at 342.] Use of the matrix is encouraged, but it is not required. [Doc. 102 at 409.]

21.   Human Resources provides spreadsheets and information that managers can use in the selection process, but there is no standard type of spreadsheet that is supposed to be used. [Doc. 101 at 353.] These spreadsheets are just tools available to help managers in their selection process. [Doc. 102 at 409.]

22.   The selecting manager determines the position functions and accountabilities on the matrix.  After reviewing resumes for the relevant skills and abilities, the selecting manager will rate them. [*Id.* at 410.]

23.   Kathy Brinson ("Brinson"), a TVA Human Resources employee, assisted Fitzgerald throughout the selection process.  The process was modeled after a 2003 selection where King was selected for a L&D Rep Level C position. [Doc. 101 at 337; D. Ex. 40 at 14-15.]

24.    Brinson met with Fitzgerald to discuss the process to be used for the selection of the L&D Rep Level C position. [Doc. 102 at 414.] Fitzgerald also sought feedback from three other TVA employees. [D. Ex. 20.] The steps proposed by Fitzgerald were similar to steps used in other Organizational Effectiveness group selections. [Doc. 102 at 417.]

25.    Fitzgerald informed applicants of the three-step process to be used in making the selection decision. "Step one consists of an initial review of submitted resumes, Form 9824s, and employee PHRs. Step two consists of more specific information submitted by you that is directly related to the requirements of the position. Step three consists of a structured interview process." [P. Ex. 7.]

26.    Fitzgerald sought additional specific information relating to the job duties of the position. [Doc. 102 at 414-15, 420.] This included information regarding information systems, registration and scheduling, facilities operation, Microsoft Office products, and travel. [P. Ex. 7.] The applicants were given a few days to submit the requested information, and the information was forwarded to Fitzgerald. [Doc. 102 at 420.]

27.    In response to the request for supplemental information, Plaintiff submitted work samples to Fitzgerald. [Doc. 100 at 104.] Though Plaintiff's submission was voluminous, the samples were repetitive and did not fully address particular areas of experience that Fitzgerald sought. [D. Ex. 40 at 53.]

28.    Fitzgerald determined what the principal functions and accountabilities would be for the selection matrix. [Doc. 102 at 466.]

29. The file for the L&D Rep selection included a "HRIS Mass Vacancy Selection Worksheet" that includes categories on previous job titles, salary grades, and effective dates. [*Id.* at 473; P. Ex. 12.]

30. The review of candidate's resume, work documentation, personal history record ("PHR"), and record of experience are accounted for in the matrix under the "position functions and accountabilities" column. [Doc. 102 at 420; D. Ex. 1.]

31. Brinson reviewed Fitzgerald's matrix, interview questions, and selection process as a whole. [Doc. 102 at 421, 428.] Both she and her supervisor, Jim Raines, had no problem with them. [Doc. 102 at 428.]

32. Fitzgerald viewed the following skills as critical to the L&D Rep Level C position: (1) Information systems; (2) Registration and scheduling; (3) Facilities operation; and (4) Microsoft Office products; and (5) Travel requirements. [D. Ex. 40 at 34.]

33. Fitzgerald developed an interview list of six candidates he wanted to interview. [Doc. 102 at 421.]

34. The interviews were structured in nature. This means that the same questions were asked of each interviewee. [D. Ex. 40 at 106.]

35. Interview panel members were given a packet that included interview questions and model answers of effective and ineffective answers. [Doc. 101 at 299, 372.]

36. Fitzgerald was not a member of the interview panel, but he was present in the room during the interviews. [*Id.* at 313.]

37.  After the interview panel members individually scored the candidates, Fitzgerald took the ratings and arrived at a final candidate score. [*Id.* at 364.]

38.  The preferred candidate for selection was identified by the matrix on the basis of work histories, supplemental information, and interview ratings. [Doc. 102 at 425.]  The preferred candidate, Haney, had the highest scores for both the "application, resume, PHR, work documentation scoring rank" and "interview scoring rank" categories. [*Id.* at 426; D. Ex. 6.]

39.  Fitzgerald determined the weight given to the various categories on the selection matrix. [D. Ex. 40 at 24-25.]

40.  At the time of the selection, Plaintiff was 54 years old. [Doc. 100 at 113.]

41.  At the time of the selection, Michelle Haney, the selectee, was 30 years old. [Doc. 101 at 343.]

42.  From spring of 2001 to the time of the selection, Plaintiff worked in the STAR 7 Program.  STAR 7 was a learning, education, and learning development program. [Doc. 100 at 114.]

43.  Plaintiff's duties as part of the STAR 7 Program involved "all of the workshop mobilization."  Such duties include entering data, running reports, monitoring audio and visual equipment, and checking on the registration process for attendees of the STAR 7 program. [*Id.* at 115.]

44.  As part of the reorganization, Plaintiff's job was eliminated.  Her duties would be "rolled over" into the L&D Rep, Level C position. [*Id.* at 116.]

45.	Plaintiff had never held a L&D Rep job, either Level C or Level B. [Doc. 101 at 261.]

46.	With respect to evaluation forms, Plaintiff did not do anything with the evaluation forms other than transport them from the workshop to Fitzgerald's group. [*Id.* at 215.]

47.	Plaintiff's STAR 7 position description describes the position's purpose:

Provides administrative support for the overall STAR 7 initiative including budget management, charge-back management, business plans, workshop mobilization and material supply-chain, on-site support for workshop implementation, inventory management of all STAR 7 materials, status reporting of workshop attendance and delinquency management, etc.

[P. Ex. 35.]

48.	Plaintiff had some skills that overlapped with skills identified as critical to the L&D Rep Level C position. [D. Ex. 40 at 32.]

49.	If Plaintiff had been selected for the L&D Rep Level C position, she would have received a higher salary. [Doc. 101 at 400.] The move would not be purely lateral because of the increased salary and change in duties. [Doc. 102 at 458.]

50.	Haney's job description summary describes L&D Rep Level B typical duties as including "competent user of Automated Training Information System (ATIS) and other IT systems and databases" in addition to other duties related to "campuses, learning centers, resource centers or libraries" and other "multi-functional duties." [D. Ex. 3.]

51.	As a L&D Rep Level B, Haney supported Judy Santos, a L&D Rep Level C, with tasks like directing individuals, checking equipment, distributing materials. [Doc. 103

at 679.] Haney also provided support to the Scholarship Program and served as a backup to L&D Reps Level C when they were unavailable. [*Id.*]

52.   Prior to the selection at issue, Fitzgerald was one of Haney's direct supervisors, along with Wayne Clement. [Docs. 101 at 391; D. Ex. 40 at 10-11.] After the reorganization, Haney's position as L&D Rep Level B was to be eliminated. [Doc. 101 at 394.]

53.   The L&D Rep Level B position is in the same job family as the L&D Rep Level C position. [*Id.* at 395.] In the normal course of business, an employee at Level B would be reclassified as Level C in a year to 18 months without going through the selection process. [*Id.* at 397.]

54.   On June 8, 2004, Haney was selected for the L&D Rep Level C position. [D. Ex. 6.] On June 14, 2004, Haney received an approximately $8,000.00 pay raise. [P. Ex. 37.]

55.   A "relational database" is a description of a technology that allows a user to point and pull information from tables depending on the reporting requirements.  Access and Oracle are used to track, define, and select different training at TVA.  ATIS is a program based on a relational database. [Doc. 101 at 294.]

56.   ATIS is a database containing training requirements for TVA employees. [Doc. 102 at 550-51.] There are three level of users for ATIS: TRNDISP (lowest level of user), TRNUSER (midlevel user), and TRNADMIN (system administrator). [*Id.* at 553-54.]

57.   Haney had experience with ATIS and Access prior to her selection for the L&D Rep Level C position.  Access knowledge is used in creating queries to track down

information, troubleshooting, and verifying information.  Haney also ran ad hoc reports and created ad hoc reports in 2003 and 2004. [*Id.* at 518-19, 547.]

58.  Knowledge of Access is not required to use ATIS. [*Id.* at 544.] Knowledge of Access is needed to do training evaluations that were part of the Fitzgerald staff's responsibilities. [*Id.* at 544-45.]

59.  Prior to her employment with TVA, Haney had exposure to Access through her employment at Knoxville Business College. [Doc. 103 at 662.]

60.  System Administrator status is the highest ATIS user level.  These users have the ability to create and modify the curriculum and populations. [Doc. 102 at 556.]

61.  In 2000, Haney was trained as an ATIS System Administrator to work on tuition reimbursement. [*Id.* at 559.] As a System Administrator, she received an ID and password. [*Id.*] As a System Administrator, Haney set up a tuition reimbursement for the year plus time period and created a user guide to train another employee to be System Administrator.  [*Id.* at 560-61.]

62.  When Haney applied to the L&D Rep Level C position, she used Access in relation to the Assessment Evaluation database system and SPSS system. [Doc. 103 at 678.]

63.  For the period from October 1, 2002 to September 30, 2003, Haney's service report for her L&D Rep Level B position outlined her duties on TVA university evaluation database, on multi-functional duties, and on other elements of service.  The TVA University evaluation database description stated "reviews, evaluates, verifies records for accuracy; operates scanning system or enters data manually, runs reports, posts

reports/results to Web site, notifies relevant staff of potential problems associated with TVA learning activities. Assisted in development of new quarterly report format for TVAU Leadership Institute and presented to Design & Development staff." [P. Ex. 13.]

64. In Haney's employee service report for the period from October 1, 2002, to September 30, 2003, she was described as "continu[ing] to make valuable contributions to the A&E function through her growing expertise in using SPSS, scanning technology, Microsoft Access, Excel, and TVA Web infrastructure. Her work is accurate, timely, and virtually error-free. Her role as receptionist for TVA University continues to be executed with expected levels of professionalism." [*Id*.]

65. Plaintiff was not authorized as a System Administrator on ATIS. [Doc. 102 at 577.] Her status, TRNSTAR7, fit into the midlevel user class. [*Id*. at 554.]

66. At the time of her selection, Haney did not have System Administrator status on ATIS. [Docs. 102 at 604; 103 at 710.]

67. ATIS status can change depending on organizational needs. [Doc. 102 at 595.]

68. Plaintiff has not worked in Microsoft Access ("Access"). [Doc. 100 at 157.] She did not use Access to look at information on ATIS or general reports. [Doc. 101 at 226.] She did not know how Fitzgerald's group used Access. [*Id.* at 230.]

69. According to Fitzgerald, the difference between Plaintiff and Haney was their relative experiences with system administration, automated computer information systems, and experiences with Microsoft Office products. [D. Ex. 40 at 36.]

70. According to her trial testimony, Plaintiff was nervous at her interview. During her interview, she was asked questions about relational databases, and she "went blank." [Doc. 100 at 164.]

71. During Haney's interview, Haney provided specific examples of her knowledge of and experience with Access and ATIS. [Doc. 102 at 624.] She explained her experience with relational databases by providing examples manipulation of data and generation of reports. Plaintiff expressed some experience with data manipulation and exporting of data, but interview panel member, Donna Curry ("Curry"), observed that Haney's technical experience was higher to that of Plaintiff. [Doc. 101 at 304-05.] Curry further observed that Plaintiff "indicated that she didn't have the experience" with Access. [*Id.* at 306.] Panel member Ricky Kennedy ("Kennedy") viewed Haney as having more experience than Plaintiff with relational databases, pulling information, and doing ad hoc reporting. [*Id.* at 356.] Panel member Marvin Dennis Mynatt was "impressed" by Haney's responses and her discussion of her experience. [Doc. 102 at 627.]

72. At the interviews, five of the six interviewees appeared to have no trouble with the relational database questions. [D. Ex. 40 at 152-53.]

73. Plaintiff has acknowledged that she does not know whether the interview scores were inaccurate. [Doc. 101 at 256.]

74. Portfolios of work samples were not accepted by the panel at the interviews. [Doc. 100 at 95.]

75. Fitzgerald did not express his opinion of the candidates to panel members, and he did not try to influence their evaluation of the candidates. [Doc. 101 at 302; Doc. 102 at 623.] Panel members did not discuss their ratings, and arrived at their scores independently. [Doc. 101 at 304, 364.]

76. The candidates' overall scores were the result of weighted calculations. [D. Ex. 40 at 24-25.] The Position Function and Accountabilities ("PFA") scores were weighted at 70, and the interview scores were weighted at 30. Thus, the overall scores were calculated by adding PFA scores (multiplied by 30) to interview scores (multiplied by 70). [D. Exs. 1; 40 at 24-25.]

77. For the PFA category, Haney had an overall score of 27. Plaintiff had an overall score of 25. On the interview portion, Haney scored a 25.925, and Plaintiff scored a 21.4375. Haney's overall score from the position selection matrix was 2668, and she ranked first in submitted materials, interview scoring, and individually by each member of the interview panel. [D. Exs. 1, 6.] Plaintiff's overall score from the position selection matrix was 2393. She ranked second on her submitted materials and fifth out of six applicants on her interview. [D. Ex. 6.]

78. After the interviews on June 3, 2004, Fitzgerald informed Brinson of Haney's selection. [D. Exs. 6, 8, 9, 10, 13, 14, 15.] Later in June, Fitzgerald called Plaintiff to inform her of Haney's selection. [Doc. 100 at 164.]

79. During the Spring of 2004, TVA University offered classes on interviewing skills. [*Id.* at 78.] Classes on interviewing skills, resume writing, and job search strategies were available to anyone at TVA. [Doc. 103 at 646.]

80. In May of 2004, Haney took courses entitled "Resumes that Work," "Interview Success," and "Job Search Strategies." [*Id.* at 647; P. Ex. 15.]

81. In the spring of 2004, Santos scheduled classrooms for employees on Lane Fitzgerald's staff. Though Santos scheduled the classrooms, she has no knowledge of what occurred in the classrooms. [Doc. 100 at 51-52, 76.]

82. Fitzgerald's staff had several meetings in the Spring of 2004 where Fitzgerald recommended his staff to search for information on jobs. [Doc. 102 at 541.] Fitzgerald's full-time staff consisted of Jeffrey Krum, Darren Smith, and Haney. [*Id.* at 542.]

83. In the spring of 2004, Fitzgerald offered Haney the opportunity to practice her interviewing skills. [Doc. 103 at 649.] The practice interview took place in March of 2004. [*Id.* at 640; D. Ex. 38.]

84. Other than the practice interview with Fitzgerald in March of 2004, Haney did not participate in any other mock interviews with Fitzgerald or others in her group. [Doc. 103 at 657.]

85. Fitzgerald did not discuss or advise Haney on the L&D Rep Level C position prior to the interviews. [*Id.* at 707.] He did not share the interview questions with any candidates prior to the interviews. [D. Ex. 40 at 29.]

17

86.     The L&D Rep Level B and Level C positions differ in regard to the depth and detail of duties. [Doc. 103 at 680.]

87.     After Haney's selection, she performed duties under ATIS and other IT systems immediately, as was needed. [Doc. 103 at 681; D. Ex. 40 at 58.]

88.     On June 17, 2004, Haney requested greater access to the campus calendar to add and make changes to campus activities. [Doc. 101 at 393; P. Ex. 30.]  After the selection, Santos trained Haney in scheduling. [Doc. 100 at 46, 82.]

89.     On June 17, 2004, Santos wrote Haney, "In the past the registers have pretty much overlapped in duties with the exception of several duties (contracts, budget/accounting, system administrator, scheduling, metrics – now we have all the other duties from those that have left.  I don't know how we are going to do the work of 5 with 2!" [P. Ex. 30.]

90.     On August 18, 2004, Haney was added as a System Administrator.  As of August 31, 2004, Haney had created 140 curricula and populations as System Administrator. [D. Ex. 34, 35.]

## II.     CONCLUSIONS OF LAW

1.      The ADEA provides that "[i]t shall be unlawful for an employer – (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).

2.    Age discrimination can be established by either presenting direct evidence or discrimination or by proceeding under the *McDonnell Douglas* burden-shifting framework. *See Briggs v. Potter*, 463 F.3d 507, 514 (6th Cir. 2006). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (citation omitted). Plaintiff has not presented direct evidence of discrimination, so she cannot prevail under a direct evidence theory of age discrimination.

3.    ADEA claims based principally on circumstantial or indirect evidence are analyzed under the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). Under the *McDonnell Douglas* framework, a plaintiff must establish the prima facie case of age discrimination. In order to establish a prima facie case of age discrimination relying upon indirect evidence of discrimination under the *McDonnell Douglas* burden-shifting framework, a plaintiff must establish that (1) she is a member of the protected class, namely, at least 40 years of age; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently from similarly situated employees outside the protected class. *See Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004).

4.    Plaintiff has satisfied the prima facie case for her age discrimination claim: (1) Because she was 54 years of age at the time of selection, she was at least 40 years of

age during the relevant period; (2) A failure to hire constitutes an adverse employment action under the ADEA, 29 U.S.C. § 623(a)(1); (3) Plaintiff was qualified for the position at issue as evidenced by the "Position Selection Matrix" indicating that she met the minimum qualifications for the L&D Rep Level C position; and (4) Haney, the selected candidate, was not yet 40 years of age at the time she was hired for the L&D Rep position in 2004. Further, Defendants do not dispute that Plaintiff can prove the prima facie case. [*See* Docs. 100 at 10, 113; 103 at 640; D. Ex. 1.]

5.    Once the prima facie case of age discrimination is established, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the adverse action." *Briggs*, 463 F.3d at 514. TVA has articulated such a reason. Ms. Haney had the highest Position Functions and Accountabilities score, and her interview rated highest among the six candidates interviewed for the L&D Rep position. [Doc. 95 at 4.]

6.    After an employer articulates a legitimate, nondiscriminatory reason, the burden shifts back to a plaintiff "to show that the proffered reason is a mere pretext masking the [employer's] discriminatory actions." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 624 (6th Cir. 2006). A plaintiff can demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Id.* (citations omitted). "Pretext is established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the

employer's explanation is not credible." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 342-43 (6th Cir. 1997).

7.    Plaintiff contends that the selection matrix for Ms. Haney's selection was not the functional equivalent to the King selection matrix. She points to the absence of the candidate's current organization, job title, schedule/grade, education, and related experience for each function of the position from the matrix employed by Fitzgerald. The Court concludes that the information not expressly included in the Fitzgerald matrix was accounted for in other ways. First, the file for the L&D Rep Level C selection included a "HRIS Mass Vacancy Selection Worksheet" that includes categories on previous job titles, salary grades, and effective dates. [Doc. 102 at 473; P. Ex. 12.] Though not explicitly included on the selection matrix, the information was accounted for in other parts of the selection file. Second, the employee application specifically instructs applicants to "[a]ttach a resume or description outlining the education, training, and/or experience which you feel qualify you for this position." [P. Ex. 3.] The applicants' resumes were then incorporated into the Fitzgerald matrix as evidenced by the "Position Functions and Accountabilities," which includes "Resume/PHR." [D. Ex. 1.] Thus, both matrices took into account the same information about the applicants, if only in a different visual manner. Furthermore, categories entitled "Both Minimum Qualifications Met," "Other Related Experiences," "Principle Function, Accountability, & Performance Rating Composite" provide information on the various qualifications of the applicants. [D.

Ex. 1.] The "Principle Function, Accountability, & Performance Rating Composite" category provides ratings from 0 to 5 to account for the varying levels of qualification by the applicants. Accordingly, the Court concludes that the selection matrices from the King selection and the selection at issue were functionally equivalent.

8. Plaintiff argues that Fitzgerald changed the criteria mid-stream during the selection process to include Microsoft Access, and this conduct is illustrative of his discriminatory motive. In *Browning v. Dep't of Army*, 436 F.3d 692, 697 (6th Cir. 2006), the Sixth Circuit recognized that "'the employer's motivation, not the applicant's perceptions, or even an objective assessment [] of what qualifications are required for a particular position' is key to the discrimination inquiry." *Id.* (alteration in original) (citation omitted). Furthermore, "reasonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions. Obviously, they will take additional credentials into account, if those credentials would prove useful in performing the job." *Id.*

9. In the present case, Fitzgerald viewed skills with information systems as critical to the L&D Rep Level C position. [D. Ex. 40 at 34.] The VPA alerted candidates of the position's duty to apply "knowledge & experience of principles, practices, processes & resources in admin of management information systems." [P. Ex. 1.] In his supplemental request for applicant information, Fitzgerald made a specific request for candidate experiences with "information systems." [P. Ex. 7.] The term "information systems" is broad enough to include database programs like Access and Oracle. [Doc.

101 at 370.]  Thus, the mere fact that the VPA did not explicitly mention these software programs as a criteria is unpersuasive evidence of pretext. Additionally, Brinson reviewed Fitzgerald's interview questions and selection process as a whole indicating that criteria relating to Access and Oracle were properly considered by Fitzgerald and the interview panel.  [Doc. 102 at 421, 428.]  Furthermore, the Court notes that the other applicants interviewed did not struggle with the relational database questions to the same extent as Plaintiff. [Doc. 100 at 164; D. Ex. 40 at 152-53.] Thus, Fitzgerald did not change the criteria "mid-stream" as Plaintiff contends. Rather, the evidence indicates that relational database experience and knowledge was a criteria at the time the position was initially posted, just under the broader term of "information systems."

10.    Plaintiff bears the burden of showing that the motivation was to unlawfully discriminate on the basis of age.  *Browning*, 436 F.3d at 697.  Plaintiff has not shown that the alleged irregularities in the selection process were actually irregularities as opposed to the proper exercise of a manger's discretion in changing a process to improve it or tailor it to the specific situation.  Though the selection process was patterned after a prior 2003 selection process, Brinson's testimony shows that Fitzgerald had some latitude to propose the steps of the selection process. [Doc. 102 at 416-17.]  There is no evidence that managers were required to use all of the worksheets and spreadsheets provided by Human Resources.  Rather, the evidence presented shows that these worksheets were merely tools made available to managers.

[*Id.* at 409.] Such evidence indicates that Fitzgerald properly exercised his discretion and control over the selection process and criteria for the L&D Rep Level C position.

11. The Court finds that knowledge of Access was relevant to the L&D Rep Level C position. Defendants presented testimony that knowledge of Access was necessary to perform training evaluations that were part of the Fitzgerald staff's responsibilities. [*Id.* at 544-55.] Knowledge of Access was also important for the duties of creating queries, tracking down information, troubleshooting, and verifying information. [Doc. 103 at 519.] Though Santos testified that she, as a L&D Rep Level C, did not use Access other than to perform inventory [Doc. 100 at 49], the Court notes that evidence presented at trial suggests there was some variation of responsibilities among different L&D Reps Level C. Though Santos testified at trial that she and Terry King, the employee who held the L&D Rep Level C position prior to the selection of Haney, had the same duties, Santos later testified that she was responsible for contracts and the budget while King did scheduling and served as System Administrator for TVA University and TVA corporate groups. [Doc. 100 at 21.] Other testimony at trial showed that familiarity with Access was important to another L&D Rep within TVA. [Doc. 103 at 624.] Such differences in duties suggest that Santos's experience with Access does not necessarily reflect the Access experience required of Haney, particularly considering the increased duties for the L&D Reps Level C after the reorganization. After the selection, Santos wrote Haney, "I don't know what Lane envisions for us. In the past the registers have pretty much

24

overlapped in duties with the exception of several duties (contracts, budget/accounting, system administrator, scheduling, metrics) – now we have all the other duties from those that have left. I don't know how we are going to do the work of 5 with 2!" [P. Ex. 30.] The evidence indicates that L&D Rep Level C's responsibilities prior to and after the reorganization were not necessarily identical in light of the added responsibilities caused by the reorganization itself. Additionally, Santos acknowledged at trial that at least some of her work duties as a L&D Rep Level C did involve use of Access. [Doc. 100 at 49.] Accordingly, the Court is not persuaded that Access was not relevant to the L&D Rep Level C position at issue.

12.   Plaintiff contends that Haney's selection even after failing to provide work samples constitutes evidence of irregularities in the selection process. [Docs. 101 at 265; 103 at 697.] However, the Court finds that Fitzgerald competently explained why the submission of voluminous work samples by Plaintiff did not distinguish her as a candidate from Haney. In his deposition, Fitzgerald acknowledged that Plaintiff "certainly presented more in terms of volume, in terms of weight." [D. Ex. 40 at 53.] However, Fitzgerald testified that her work samples merely showed "the same button had been pushed multiple times and then giving the output for each one of those buttons pushed." [*Id.*] Thus, Fitzgerald found that despite her voluminous notebook of work samples, Plaintiff had not fully addressed his request of addressing particular areas of experience. [*Id*.] Accordingly, the Court is not persuaded that Haney's selection despite Plaintiff's submitted work samples proves pretext in this case.

13.     With respect to the alleged interview coaching, Plaintiff has not proven that Haney received any unfair advantage. The evidence presented shows that interviewing workshops were made available to all TVA employees in the Spring of 2004, and Haney utilized the opportunity to take these career enhancing workshops in May of 2004, just prior to her interview for the L&D Rep position in June of 2004. [Docs. 100 at 78; 103 at 647; P. Ex. 15.] There is evidence that Fitzgerald provided Haney with a mock interview prior to her selection, but the evidence shows that the practice interview took place in March of 2004, prior to the April selection of Fitzgerald as manager and April announcement of the vacant L&D Rep Level C position. [Docs. 102 at 432; 103 at 640; D. Ex. 38.] The fact that Haney's application was dated January 29, 2004, does not change the Court's conclusion. Fitzgerald was not hired as Manager, Solutions Support, until April of 2004, so he was not in a position to improperly coach Haney in January or March of 2004. Thus, the evidence suggests the January date was a mere typo. Additionally, though Plaintiff presented evidence of Santos scheduling classrooms for Fitzgerald's staff in the Spring of 2004, Santos admits that she was not in the room during those meetings and has no personal knowledge of whether Haney was coached with answers for the L&D Rep Level C position. [Doc. 100 at 51-52, 76.] Thus, Plaintiff has not proven pretext on the basis of Haney's prior mock interview experiences.

14.   The VPA describes the minimum qualifications for the L&D Rep position as:

Demonstrated ability to analyze, interpret & apply appropriate business standards, processes & procedures.  Ability to participate effectively on formal & informal teams.  Ability to present ideas & information clearly through oral & written communications.  Ability to interact positively & effectively w/ internal and external customers and stakeholders.  Knowledge of TVA University.  Working knowledge of management information systems, preferably using ATIS.  Knowledge coordinating space utilization.

[P. Ex. 1.] The evidence demonstrates that Haney's job requirements in her former position overlapped with the minimum qualifications for the L&D Rep Level C position at issue. [P. Ex. 5.] The "position selection matrix" also indicates that Haney satisfied the minimum qualifications for the position. [D. Ex. 1.] The L&D Rep Level B position is in the same job family as the L&D Rep Level C position. [Doc. 101 at 395.] In the normal course of business, an employee at Level B would be reclassified as Level C in a year to 18 months without going through the selection process. [*Id.* at 397.] Additionally, Haney's employee service report stated that her "total service was fully adequate or better" for her L&D Rep Level B position during the period from October 1, 2002, to September 30, 2003.  [P. Ex. 13.] Thus, she fully satisfied the job requirements in her previous position.  Her qualifications for the L&D Rep Level C position were further buttressed by her previous work experience as described in her resume.  [P. Ex. 3.]  Plaintiff has not proven pretext on the basis of Haney's qualifications or alleged lack thereof.

15.   The Sixth Circuit has recognized that when "two reasonable decisionmakers could consider the candidates' qualifications and arrive at opposite conclusions as to who

is more qualified, then clearly one candidate's qualifications are not significantly better than the other's." *Bender*, 455 F.3d at 628. In this case, the evidence fails to show that Plaintiff's qualifications were significantly better than Haney's qualifications. First, both worked in departments involved in TVA education for comparable periods of time prior to the selection. While Plaintiff worked with the STAR 7 Program since 2001, Haney had worked with TVA University since 2000. [P. Exs. 3, 4.] Second, both candidates had significant prior work experience in the fields of administrative support and business. [P. Exs. 3, 4.] Third, both candidates had positive TVA employee service reviews in which both were rated as fully adequate or better than fully adequate in all categories of review. [P. Exs. 13, 14.] Fourth, though some of Plaintiff's STAR 7 duties would be included in the L&D Rep Level C position, some of Haney's L&D Rep Level B duties were also part of the L&D Rep Level C position as part of the consolidation of TVA University, STAR 7, and Organizational Development. [Doc. 102 at 468-69.] Fifth, Plaintiff's contention that her selection as L&D Rep Level C would have constituted a purely lateral move, is unpersuasive as to her claim of being more qualified than Haney. Plaintiff's selection would have involved a pay increase and change in duties, so the move was not purely lateral for her. Furthermore, Haney's increase in salary must be viewed in the context that she would have been reclassified as a L&D Rep Level C in the normal course of business, absent the reorganization of TVA. [Doc. 101 at 395-397.] Based on these areas, two reasonable decisionmakers could reach different conclusions as

to the better qualified candidate, and Plaintiff has not proved pretext on the basis of significantly better qualifications.

16.    In *Browning*, 436 F.3d at 698, the Sixth Circuit recognized that the relevant inquiry for age discrimination is the perception of the selecting official of the applicant's qualifications. Though Plaintiff's total time at TVA was longer than Haney, Plaintiff lacked certain technical skills that Haney possessed. As previously discussed by the Court, Access and relational database knowledge were relevant to the L&D Rep Level C position. Haney had substantial Access and ATIS experience prior to her selection [Doc. 102 at 518-19, 547], while Plaintiff acknowledged at trial that she had not worked with Access in her position with STAR 7. [Doc. 101 at 225-26, 230.] At trial, Plaintiff's inexperience with information technology was also evidenced by her reference to relational databases as "rational databases." [Doc. 100 at 137.] Plaintiff's lack of familiarity with relational databases and Access was further evidenced by her answers to questions on those software programs during her interview. [*Id.* at 164.] During her interview, Haney discussed her experience with relational databases by providing examples manipulation of data and generation of reports. Curry, an interview panel member, observed that Haney's technical experience was higher than that of Plaintiff. [Doc. 101 at 304-05.] Curry further observed that Plaintiff "indicated that she didn't have the experience" with Access. [*Id.* at 306.] Panel member Kennedy viewed Haney as having more experience than Plaintiff with relational databases, pulling information, and doing ad hoc reporting. [*Id.* at 356.] Panel member

Mynatt was "impressed" by Haney's responses and her discussion of her experience. [Doc. 102 at 627.] There is no evidence that Fitzgerald influenced the panel's interview ratings. [Docs. 101 at 302; 102 at 623.] Thus, the evidence fails to support the conclusion that the interview panel did not actually perceive Haney's qualifications in technical areas as superior to Plaintiff and a better candidate for the L&D Rep Level C position. *Cf. Dunlap v. Tennessee Valley Auth.*, No. 07-5381, 2008 WL 746217, at *4-6 (6th Cir. Mar. 21, 2008) (affirming a district court's finding of pretext when there was evidence of widespread interview score manipulation during the selection process including weighing subjective criteria heavily, widely varying scores for seemingly objective questions, and employing a "score balancing" process that resulted in revisions to score sheets).

17. The Court is not persuaded that Fitzgerald was motivated by age in his selection of Haney. Plaintiff contends that Fitzgerald's discriminatory intent was evidenced by (1) his young group; (2) Fitzgerald's articulated reasons for selecting Haney were not relevant; and (3) Haney did not perform the duties of the L&D Rep Level C after her selection. The Court recognizes that Fitzgerald's group consisted of workers all under the age of forty who socialized together; however, this fact alone does not establish discriminatory motivation on the part of Fitzgerald. Plaintiff has not presented evidence of or explained how the social relationships of Darren Smith, Jeff Krum, and Michelle Haney, relate to the alleged unlawful motivation by Fitzgerald. Though Plaintiff presents evidence that Fitzgerald's group consisted of workers under the age

of forty, she has not presented evidence that this situation was a result of age-related motivation by Fitzgerald as opposed to non-age-related factors. Thus, Plaintiff has not proven pretext by the composition of Fitzgerald's group.

18. Second, the Court is not persuaded by Plaintiff's contention that Fitzgerald's partial reliance on Haney's experience with the Tuition Reimbursement and Scholarship Program databases proves unlawful motivation by Fitzgerald. Plaintiff points to Fitzgerald's deposition testimony that Tuition Reimbursement and Scholarship Program were IT systems and databases relevant to the L&D Rep Level C position when the Coordinator, Education and Outreach, was in fact in charge of such programs after the reorganization. [Doc. 101 at 335-36.] The Court notes that the duties for Fitzgerald's position as Manager, Solutions Support, included "analyzing/reporting on full range of performance measures" and ensuring "effective use of scheduling, registering, forecasting, recordkeeping & related processes." [P. Ex. 10.] The minimum qualifications for the Manager, Solutions Support, included a preference for "information technology, statistics or related field." [*Id*.] Notably, the Coordinator, Education and Outreach, includes no information systems or statistical qualification requirements. [P. Exs. 9, 10.] Thus, Fitzgerald was responsible for the technical or database side of the Organizational Effectiveness group, which would include databases relating to Tuition Reimbursement and Scholarship programs. Thus, familiarity with such databases would be an appropriate consideration for the L&D Rep Level C working for Fitzgerald even though the Coordinator, Education

and Outreach, managed the Tuition Reimbursement and Scholarship Program. Accordingly, Plaintiff has not proven pretext on this basis.

19. Third, Plaintiff contends that Haney did not perform her duties for the L&D Rep Level C position after her selection by Fitzgerald further indicating his unlawful motivation. Though Santos testified that Haney's job did not change after her selection, Santos also testified that she trained Haney in scheduling after her selection. [Doc. 100 at 46, 82.] Furthermore, Haney requested greater access to the campus calendar to add and make changes to campus activities in an email dated June 17, 2004, less than a month after her selection and prior to the July of 2004 effective date for the reorganization. [Doc. 101 at 393; P. Ex. 30.] Such evidence indicates that Haney's responsibilities did change after her selection contrary to Santos's testimony. Additionally, Santos testified that Haney never took on the responsibilities of an L&D Rep Level C while Santos worked for TVA. [Doc. 100 at 50.] However, the evidence indicates that Santos and Haney would not necessarily have identical job duties since they would be responsible for work previously done by three additional individuals. Santos wrote Haney, "I don't know what Lane envisions for us . . . now we have all the other duties from those that have left. I don't know how we are going to do the work of 5 with 2!" [P. Ex. 30.] The Court is also unpersuaded by Santos's testimony as to Haney's System Administrator status. At trial, Santos testified that King, the previous L&D Rep Level C, worked as the System Administrator for TVA and other TVA corporate groups. [Doc. 100 at 21.] Santos also testified that Haney had never

been a System Administrator under ATIS and never took over the responsibilities of the L&D Rep Level C while Santos worked at TVA. [*Id.* at 48, 50.] However, Haney was added as a System Administrator on August 18, 2004, and created 140 curricula and populations as a System Administrator as of August 31, 2004. [D. Exs. 34, 35.] Thus, the evidence shows that Haney performed System Administrator duties just as the previous L&D Rep Level C had done. Thus, Santos's testimony as to whether Haney performed the relevant duties is unpersuasive, and Plaintiff has not proven pretext based on the basis of Haney not performing the work responsibilities of an L&D Rep Level C after her selection.

20. Furthermore, taken individually or collectively, the Court concludes that Plaintiff has not proved unlawful motivation by Fitzgerald on the bases of (1) his young group; (2) Fitzgerald's articulated reasons for selecting Haney were not relevant; and (3) Haney not performing the duties of the L&D Rep Level C after her selection.

21. Because Plaintiff has not proven that TVA's proffered reason is pretext masking discriminatory actions, she has not met her burden to prove that the hiring decision was based on her age. Accordingly, the Court finds in favor of Defendants Tennessee Valley Authority; Board of Directors of the Tennessee Valley Authority, Bill Baxter, Chairman, and Skila Harris, Director, in their official capacities.

## III.    CONCLUSION

In summary, the Court finds that Plaintiff Laura Katherine McBee has failed to prove by a preponderance of the evidence that the reason articulated by Defendants for their hiring decision was pretextual.  She has not met her burden of proving that the proffered reason (1) has no basis in fact, (2) did not actually motivate Defendants' challenged conduct; or (3) was insufficient to warrant the challenged conduct.  Based upon the foregoing findings of fact and conclusions of law, the Court will find in favor of Defendants Tennessee Valley Authority and Board of Directors of Tennessee Valley Authority, Bill Baxter, Chairman, and Skila Harris, Director, in their official capacities.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE